Safiya Asya BUKHARI, Plaintiff,

v.

Terrell Don HUTTO et al., Defendants.

Civ. A. No. 79–0497–R.

United States District Court,
E. D. Virginia,
Richmond Division.

April 4, 1980.

Gerald T. Zerkin, Bricker & Zerkin, Richmond, Va., for plaintiff.

Guy W. Horsley, Jr., Asst. Atty. Gen. of Va., Richmond, Va., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

Plaintiff, an inmate confined at the Virginia Correctional Center for Women in Goochland, Virginia (hereinafter "VCCW"), brings this action seeking declaratory and injunctive relief as well as monetary damages pursuant to 42 U.S.C. § 1983 against Terrell Don Hutto, Director of the Department of Corrections for Virginia, Robert M. Landon, who was Director of the Division of Adult Services of that Department, Anne Downes, Warden of the Women's Correctional Center and the individual members of the Virginia Board of Corrections. The basis of plaintiff's complaint is that Mrs. Downes and the other named state correctional officials have violated her constitutional rights under the First, Eighth, and Fourteenth Amendments by maintaining plaintiff in a restrictive custody status at the prison for a prolonged period of time. Jurisdiction is properly invoked under 28 U.S.C. § 1343.

The facts surrounding plaintiff's claims, for the most part stipulated by the parties, are as follows:

Plaintiff, Safiya Asya Bukhari, was convicted in state court in 1975 of possession of a machine gun, attempted robbery and attempted murder, for which she received a sentence totaling forty years. Plaintiff had no criminal conviction prior to that time. Upon her incarceration at VCCW on April 17, 1975, plaintiff was placed in "B" custody, a medium security status at the prison. VCCW is the only penal institution for women operated by the Virginia Department of Corrections, other than a small work-release program in Richmond for "A" custody women. Shortly after plaintiff's arrival at VCCW, the Federal Bureau of Investigation ("FBI") contacted the warden, Mrs. Downes, and other prison officials and informed them of plaintiff's suspected activities as a member of a militant underground organization known as the Black Liberation Army. The FBI requested that it be advised in the event that plaintiff escaped, became eligible for parole, or was to be discharged.

On December 31, 1976, plaintiff and another inmate escaped from VCCW. Prior to her escape, plaintiff had maintained an excellent institutional record, having progressed through the housing system to attain "honor status" under minimum security control. In February of 1977, defendant Downes was notified that plaintiff had been apprehended in Poughkeepsie, New York. Jail officials there reported that plaintiff had spoken of her ties with the Black Liberation Army and of her reluctance to return to VCCW, based upon allegedly inadequate medical care at the prison. Fearing another escape attempt, New York State Police escorted VCCW employees with plaintiff through New York and New Jersey on their way back to Virginia. Plaintiff was returned to VCCW on March 24, 1977.

From March 28, 1977, to January 13, 1978, plaintiff was classified in "segregation" in Cottage 3, the maximum security building at VCCW. The cells in Cottage 3 constitute the only housing available at the prison for inmates deemed to be security risks or who otherwise warrant substantial supervision. Plaintiff was convicted of escape and sentenced to an additional year—the minimum sentence for that offense. From January 13, 1978, until the present, plaintiff has been classified as "C" custody and has continued to be housed in Cottage

3. "A" and "B" custody inmates are housed in the general prison population. In addition to the physical and recreational restrictions inherent in "C" custody, "C" custody inmates are less likely to be paroled than "A" or "B" custody inmates. Further, plaintiff is precluded from enrolling in college level courses in which other inmates are allowed to participate.

Although the Institutional Classification Committee (hereinafter "ICC") has twice recommended that plaintiff's custodial status be reduced from "C" to "B", Warden Downes and the Central Classification Board have disapproved those determinations. Mrs. Downes admits that her decision to maintain plaintiff in her restrictive custody status is based upon plaintiff's alleged political associations with the Black Liberation Army, her prior escape, and the length of her sentence. Mrs. Downes' understanding of this underground group and of her political beliefs is based, in large part, upon FBI reports. Plaintiff has not been confronted with any of the allegations contained in those reports concerning her past political activities. Mrs. Downes admits that plaintiff is not a disruptive influence within the institution and that she would probably not become one were she to be released to the general population.

The duration of plaintiff's confinement in segregation and in "C" custody is much longer than that for other inmates at VCCW, including her fellow escapee. Sixteen inmates at VCCW, excluding plaintiff, who have escaped and been recaptured since April 27, 1975, have served an average of 3.25 months in segregation and 3.85 months in "C" custody. Six of those escapees were transferred directly from segregation to "B" custody after serving an average of 4.6 months. Plaintiff served 10.5 months in segregation and has to date served over 26 months in "C" custody. In addition, the nature of plaintiff's confinement in "C" custody at VCCW is more restrictive than that for "C" custody at major male institutions. Male inmates in "C" custody are housed with other inmates and have the opportunity to work and interact with "A" and "B" custody inmates as well as fellow "C" custody inmates. In addition to greater recreational freedom, male inmates in "C" custody enjoy greater opportunities for participation in educational programs.

Plaintiff complains that the defendants' consideration of plaintiff's political beliefs and associations in maintaining her in restrictive custody violates her First and Fourteenth Amendment rights. Further, plaintiff argues that defendants' reliance on unsubstantiated FBI allegations of past misconduct by plaintiff without confronting her with them violates plaintiff's right to due process under the Fourteenth Amendment. With regard to the nature of her confinement, plaintiff contends that her prolonged isolation in segregation and in "C" custody has caused her severe emotional distress in violation of the Eighth Amendment guarantee against cruel and unusual punishment. Finally, plaintiff claims that the disparity between the conditions of "C" custody in men's prisons and those at VCCW constitutes sex discrimination in violation of the equal protection clause of the Fourteenth Amendment.

The Court heard evidence from all parties and entertained defendants' motion to dismiss on October 24, 1979. The Court granted the motion to dismiss with regard to the members of the Virginia Board of Corrections, and determined that a personal visit to the VCCW at Goochland, Virginia, would aid the Court in its decision. Soon after the Court's visit to the institution, defendants filed and were granted a motion to take additional evidence. On December 20, 1979, the Court heard further evidence consisting for the most part of accounts of the armed escape on November 2, 1979, of Joanne Chesimard, an alleged underground compatriot of plaintiff, from the Clinton Correctional Center in New Jersey. A suspect implicated in Chesimard's escape used the supposedly fictitious name of "Dingus Obedele". Plaintiff had earlier requested that the name "Imari Obadele" be placed on her list of approved visitors at VCCW.

With the benefit of evidence adduced at both hearings, and of all parties' pre-trial and post-trial pleadings, the Court finds plaintiff's claims ripe for disposition.

### I. *FIRST AMENDMENT CLAIM*

■ Plaintiff's First Amendment claim alleges discriminatory confinement of plaintiff in maximum security based solely upon her political associations and beliefs. In support of this claim, plaintiff cites *Sostre v. McGinnis*, 442 F.2d 178 (2d Cir. 1971), *cert. denied* 404 U.S. 1049, 92 S.Ct. 719, 30 L.Ed.2d 740 (1972), which held that the segregated confinement of an inmate based upon his black militant political beliefs was unlawful. While acknowledging that incarcerated individuals cannot retain all the constitutional privileges enjoyed by citizens outside the prison walls, the Court held that prisoners do retain the "freedom from discriminatory punishment inflicted solely because of his beliefs, whether religious or secular." *Id.* at 189. For First Amendment purposes, the Court finds no meaningful distinction between punishment and classification to a segregated or maximum security status. *Howard v. Smyth*, 365 F.2d 428, 429 (4th Cir. 1966).

■ While the Court acknowledges the First Amendment principle invoked in *Sostre v. McGinnis, supra,* the Court finds it inapposite to plaintiff's case. Once incarcerated, plaintiff retained only those First Amendment rights "not inconsistent with [her] status as a prisoner or with the legitimate penological objectives of the correction[al] system." *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974); *Pittman v. Hutto*, 594 F.2d 407, 410 (4th Cir. 1979). Where exercise of her rights to free speech or association pose a potential danger to prison discipline or security, plaintiff's rights under the First Amendment may be curtailed in any manner consistent with those penological objectives and due process of law. *See Jones v. North Carolina Prisoners' Union*, 433 U.S. 119, 125–26, 97 S.Ct. 2532, 2537–38, 53 L.Ed.2d 629 (1977). Clearly plaintiff's freedom of association is subject to the limita-

tions dictated by her " 'status as a prisoner' and the operational realities of a prison." *Id.* at 129–32, 97 S.Ct. 2532 [2539–2541]. So also may plaintiff's freedom of speech be curtailed where prison administrators reasonably believe that the exercise of that right possesses the likelihood of interfering with prior security. *Id.; Pittman v. Hutto, supra* at 411.

■ The Court finds no violation of plaintiff's First Amendment rights presented by the facts of this case. Defendants, particularly Mrs. Downes, sincerely believe that plaintiff's prior affiliation with a purportedly militant underground group qualify her as a unique security risk at VCCW. This realization was prompted by plaintiff's escape in 1976 and has been supported recently by the escape of Joanne Chesimard from the New Jersey prison, allegedly with the aid of four armed members of this same underground organization. Throughout her incarceration, the FBI has warned prison officials of plaintiff's alleged potential threat to security and has monitored her activities at VCCW. Based upon this factual background, the Court can only conclude that defendants' belief was a reasonable one, upon which they acted in an entirely reasonable manner.

The instant case does not present the same situation found by the U. S. Court of Appeals for the Second Circuit in *Sostre v. McGinnis, supra.* The court in *Sostre* based its First Amendment holding on the factual findings of the district court. The district court had found that the prisoner's prison writings, his refusal to answer questions about a particular political organization, and his possession of political literature neither caused any security risk nor provided the basis for any reasonable apprehension of such risk in the prison officials' minds. *Sostre v. Rockefeller*, 312 F.Supp. 863, 876 (S.D.N.Y.1970). Here, plaintiff's membership in an underground organization that is currently suspected of instigating the armed escape of one of its members from prison, when coupled with plaintiff's own escape, the nature of plaintiff's criminal convictions, and the length of her sentence,

supports, at a minimum, the reasonable apprehension that plaintiff poses a unique security risk. Consideration of plaintiff's political associations and beliefs is no less appropriate than consideration of past crimes where they suggest the likelihood of a distinct threat to prison security. The Court finds no implication from the evidence that defendants' restrictive classification of plaintiff was based in any way upon any ideological disapprobation of her beliefs, unrelated to a legitimate concern for institutional security.

## II. *DUE PROCESS*

Plaintiff argues that the defendants' decision to maintain her in "C" custody based, in part, upon her ties with the Black Liberation Army was arbitrary and capricious, and denied her due process of law under the Fourteenth Amendment.[1] Plaintiff contends she is entitled to certain procedural safeguards before defendants may base her classification on informal FBI reports of her criminal activities. Plaintiff seeks some form of hearing and confrontation with the allegations against her, tailored to the standards set forth in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

■ The Court reluctantly finds no entitlement to the procedural safeguards set out in *Wolff* by which to challenge an administrative decision or its underlying rationale. The U. S. Court of Appeals for the Fourth Circuit has held that the procedural requirements of a statement of reasons by prison officials, hearing with counsel, confrontation and cross-examination, or other opportunity for response by the prisoner, are not applicable to reclassification proceedings of the ICC. *Cooper v. Riddle*, 540 F.2d 731, 732 (4th Cir. 1976). Classification decisions by the Central Classification Board or the warden must surely fall within the scope of that decision. *Cf. Altizer v. Paderick*, 569 F.2d 812, 813 (4th Cir.), *cert. denied*, 435 U.S. 1009, 98 S.Ct. 1882, 56 L.Ed.2d 391 (1978).

The Court's reluctance stems from the particular facts of plaintiff's case. Plaintiff's institutional record, save her escape in 1976, has been excellent, yet other escapees have received more lenient treatment. The factor that sets her apart from others is her association, prior to confinement, with an allegedly militant underground organization. Plaintiff has not been allowed to formally challenge the fact of her association with this group or the fact of its militant or illegal nature. Further, her rumored involvement in several of the group's criminal activities has gone unsubstantiated except for informal FBI reports to prison officials. It is the more onerous in that apparently nothing plaintiff herself could do or refrain from doing would trigger a reduction in her classification. The unique security threat plaintiff poses results entirely from suppositions and allegations about a group of individuals outside the prison over whom plaintiff has no control.

Plaintiff's situation, in the Court's view, is analogous to that of the inmate plaintiff in *Paine v. Baker*, 595 F.2d 197 (4th Cir.), *cert. denied*, 444 U.S. 925, 100 S.Ct. 263, 62 L.Ed.2d 181 (1979), who sought under 42 U.S.C. § 1983 the expungement of erroneous information from his prison file. Claiming that an adverse parole decision must surely have been based on erroneous information in his file concerning his past criminal record and prison adjustment, Paine asserted a due process right to have his correctional file free from such allegedly false and prejudicial information. The court held in *Paine* that a prisoner may invoke such a due process right only where he or she alleges (1) that certain information is in the prisoner's file, (2) that the information is false, and (3) that it is relied upon to a constitutionally significant degree. *Id.* at 201. The Court added a jurisdictional prerequisite for asserting this right under § 1983, consisting of an application by the prisoner to the proper prison

---

1. Plaintiff apparently does not challenge the initial decision to reclassify her from "B" to "C" custody by the ICC in January, 1978, nor the subsequent ICC recommendations to reduce her status from "C" to "B" custody.

authorities in the first instance for expunction of the erroneous matter from his file.

◼ The Court concludes that plaintiff in the instant case is entitled to a similar due process right to clear her "file" of any false information concerning her association with the Black Liberation Army and her criminal activities while a member thereof. The Court uses the term "file" for the lack of any other description, since it is unclear whether all of the FBI communications implicating plaintiff in underground activities are recorded or, if recorded, are kept in a single location. Nevertheless, whatever the nature of the factual record supporting the defendants' decision to maintain plaintiff in "C" custody, she is entitled to challenge any erroneous information contained therein.

◼ Plaintiff has clearly met the first two requirements set forth in *Paine* of alleging that certain information is in her "file" and that it is false. The Court finds further that plaintiff has met the third requirement of reliance upon that information by defendants to a constitutionally significant degree. The court in *Paine* established a two-pronged test for meeting this third requirement: first, the nature of the adverse administrative decision must be within the ambit of the due process clause, and second, the false information itself must be significant and not merely technical in nature. *Id.* at 202. Decisions to deny parole or statutory good time credits or to revoke parole involve an inmate's conditional liberty interest and invoke the due process clause. *Id.; Franklin v. Shields*, 569 F.2d 784, 790 (4th Cir. 1977), *aff'd in part*

*and rev'd in part* 569 F.2d 800 (4th Cir. 1978) (en banc), *cert. denied*, 435 U.S. 1003, 98 S.Ct. 1659, 56 L.Ed.2d 92 (1978). However, decisions to transfer prisoners from one institution to another or to reclassify prisoners have been held outside the scope of the due process clause. *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Cooper v. Riddle, supra*. Although defendants' decision to keep plaintiff in "C" custody would seem, at first blush, to constitute this latter type of administrative decision, the parties have stipulated that "C" custody inmates are less likely to be paroled—a consequence which does implicate a liberty interest of constitutional significance. *See Paine v. Baker, supra* at 202; *Williams v. Stacy*, 468 F.Supp. 1206 (E.D.Va.1979). With regard to the information itself, the alleged errors are clearly significant as they involve plaintiff's past criminal conduct upon which defendant Downes admits she relies.

For this Court to enforce plaintiff's due process right, however, there must be a denial by the prison authorities to expunge or to disregard the allegedly false information concerning her Black Liberation Army activities. *Id.* Plaintiff should, therefore, apply to the prison officials, presumably to Mrs. Downes, to determine what particular false information, if any, was relied upon and what the basis of that information was. Plaintiff may then challenge any false information contained in the prison officials' response. A record should be kept concerning this procedure as explained in *Paine, supra*.[2] In the event that plaintiff's chal-

---

**2.** The Fourth Circuit recommended the following procedure in *Paine*:

An inmate who believes his file to contain false information should notify prison officials of this fact in writing, specifying what information he believes is false and what the true facts are. The prison officials will be given a reasonable time to respond.[5] If the

[5] We think that in most instances prison officials should respond within 60 days. If resolution of the disputed facts is not possible within that time, the inmate should be so notified. If administrative action, i. e., parole hearing, is pending within the 60 days, the inmate's letter should be put in his file so

that persons using the file will be put on notice that particular facts are disputed.

officials inform the inmate that the challenged information is not in fact in his file, no further action will lie, as we presume the good faith of prison authorities. If the officials find that erroneous information is contained in the file, the information should be expunged and the inmate so notified. If the officials inform the inmate that the challenged information is in his file, but they consider it to be correct, the inmate should be informed of the basis of the officials' belief and the inmate's letter should be placed in his file. The inmate will have an action in

lenge to the information in her file proves unsuccessful, she may return to this Court for an adjudication of the validity of such information.[3]

■ The Court is satisfied that this procedure effectuates the proper balance between "institutional needs and objectives and the provisions of the Constitution that are of general application." *Wolff v. McDonnell, supra*, 418 U.S. at 556, 94 S.Ct. at 2975. This accommodation of both prison and prisoner's interest may not, however, result in a procedure fully satisfactory to plaintiff. The Court hesitates to subject such discretionary decisions as are involved here to review under the procedures established in *Wolff*. The experience of the Court has been that prison officials exercise sound discretion and the utmost good faith in reaching administrative decisions. But where there exists the possibility that prison authorities are relying on false information or unsubstantiated rumors in making discretionary administrative determinations affecting, directly or indirectly, a liberty interest such as parole eligibility, prisoners are entitled to some procedures by which to clear their records of any errors.

## III. *EIGHTH AMENDMENT CLAIM*

Plaintiff next argues that the conditions of her confinement, particularly her isolation in Cottage 3 apart from the general prison population, constitute cruel and unusual punishment prohibited by the Eighth Amendment. Plaintiff seeks both damages and injunctive relief based upon the allegedly oppressive boredom, lack of adequate recreation, and prolonged isolation she has endured in segregation and "C"

custody. As a result of these conditions, she claims to have suffered severe emotional distress and anxiety and contends that continued confinement under these conditions will likely result in more severe psychological difficulties.

At plaintiff's initial hearing, the Court heard testimony concerning the conditions at Cottage 3 and her daily routine there. Cottage 3 consists of two main floors for housing prisoners classified in maximum security, plus a small enclosed courtyard for recreation. Both bathing and eating facilities are contained in the building. Plaintiff's day begins at 7:30 A.M. with a shower at the end of her corridor, after which she returns to dress and to clean her room. She currently works at the keypunch machine, recently installed in Cottage 3, each morning until 11:00 A.M., at which time she moves down the corridor to the pantry to work until 1:00 P.M. During her shift in the pantry, plaintiff eats with fellow "C" custody inmates who happen to be there. There are currently four other inmates in "C" custody; there has been as few as one during her confinement. Plaintiff works in the keypunch room from 1:00 P.M. until 4:00 P.M. and returns to a shift in the pantry until about 7:00 P.M. Her work schedule, pursuant to her own desires, is seven days a week. She is allowed two hours each night in the recreation room for watching television, playing cards, playing piano, or sewing with the others, if any, in "C" custody. The evidence reflects further that there have been periods in which the only other people she has seen have been officers and officials of the institution.

district court under § 1983 to challenge the validity of the information and seek its expunction; but while such action is pending, any persons examining the file will be put on notice that a dispute exists as to the validity of certain facts. An action will also lie where prison officials fail to respond to the inmate's request within a reasonable time. Having requested relief from the prison authorities and been denied same, the inmate can affirmatively plead that he has been deprived of a constitutional right—the language of § 1983.

**3.** The Court acknowledges that some inmates may be unaware that potentially erroneous fac-

tors are being considered by an institution superintendent or by the Central Classification Board relevant to his or her classification. The Court, however, refrains from requiring that inmates be routinely provided with a list of factors as required of the ICC. Often a warden or the Central Classification Board must consider factors which must necessarily be kept confidential or which are of no concern to a single inmate. Further, the Court finds that prisoners in many, if not most, instances learn what information is contained in their files. *See Paine v. Baker*, 595 F.2d at 201.

Plaintiff must then return to her cell for lights out around 9:00 P.M.

Plaintiff's opportunities for recreation and interaction with others are definitely restricted. As noted above, plaintiff sees other "C" custody inmates only in the pantry and recreation room. In addition, she sees a counselor for approximately thirty to forty minutes daily. Plaintiff is allowed restricted interaction with the general prison population for religious services and an occasional outing for prison skits, baseball games, etc., but is often under orders not to speak to others. Plaintiff's outdoor exercise is limited to one hour three times per week. One day a week she is allowed to go to the gymnasium for an hour and a half for basketball, volleyball, or music listening.

 Confinement in segregation or isolation is a punishment subject to Eighth Amendment scrutiny. *Hutto v. Finney*, 437 U.S. 678, 685, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). Of particular concern under this scrutiny are the conditions of plaintiff's confinement in segregation and "C" custody, the duration of such confinement, and the effects of her alleged isolation upon her emotional and psychological well-being.

 The conditions of plaintiff's confinement must be measured against "the evolving standards of decency that mark the progress of a maturing society." *Sweet v. South Carolina Department of Corrections*, 529 F.2d 854, 860 (4th Cir. 1975), quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958). Based largely upon the Court's visit to VCCW, the Court finds the conditions of plaintiff's confinement neither cruel nor unusual when measured against any enlightened standard of decency. The Court's unannounced visit to Cottage 3 revealed an orderly and spotless environment, free of the filth, darkness, and over-crowding so often at the heart of Eighth Amendment claims. *See, e. g., Johnson v. Levine*, 588 F.2d 1378 (4th Cir. 1978); *Kirby v. Blackledge*, 530 F.2d 583 (4th Cir. 1976); *McCray v. Burrell*, 516 F.2d 357 (4th Cir. 1975), *cert. dismissed* 426 U.S. 471, 96 S.Ct. 2640, 48 L.Ed.2d 788 (1976). Plaintiff's cell was neat, well-lit, and gener-

ally reminiscent of dormitory rooms at boarding schools and colleges, though a bit smaller in comparison. Each cell was provided with a bed, a desk, and bookshelves. Plaintiff did not complain of poor nutrition or medical care, and the Court found them more than adequate. Although lack of adequate opportunity for exercise over an extended period of time may reach constitutional proportions, the Court's review of plaintiff's daily regimen disclosed no substantial threat to plaintiff's health, notwithstanding the duration of her confinement. *Cf. Lewis v. Zahradnick*, No. 77–8156 (4th Cir. Mar. 7, 1978) (unpublished).

 The duration of plaintiff's confinement becomes more relevant with regard to her isolation from companionship and personal interaction—the "inescapable accompaniment of segregated confinement." *Sweet v. South Carolina Department of Corrections, supra* at 861. *See Johnson v. Anderson*, 370 F.Supp. 1373, 1387 (D.Del. 1974). Prolonged isolation and restricted activity can be threats to a person's psychological and emotional health. Yet Eighth Amendment standards are offended by prolonged or indefinite confinement only when basic nutrition, sanitation, and health standards are ignored or when the segregated confinement bears no reasonable relation to the purpose for which a prisoner is committed. *Sweet v. South Carolina Department of Corrections, supra* at 861. As detailed above, the Court found defendants to have observed general standards of comfort, cleanliness, health care and nutrition. Aside from plaintiff's subjective complaints of anxiety, the Court could find no probative evidence of emotional or psychological damage caused by her confinement beyond that experienced by most prisoners upon incarceration. Finally, the Court finds the requisite rational relationship between plaintiff's classification and segregation in Cottage 3 and the institution's legitimate concern for prison security. In sum plaintiff's claim of cruel and unusual punishment at this time is constitutionally inadequate.

## IV. EQUAL PROTECTION CLAIM

Plaintiff's equal protection claim is based upon the admitted disparity between the conditions of confinement in maximum security at VCCW and those at major male institutions in Virginia. The disparity consists of a more restricted freedom of movement among and interaction with the general prison population experienced by the women as opposed to the men. Defendants concede that, while the correctional guidelines make no distinction between male inmates and female inmates, some disparity results when those guidelines are put into effect at the different institutions.

■ Equal protection challenges to sex-based disparity in prison conditions constitute a relatively new phenomenon, one which has subjected to review some traditional notions of the purpose and resulting benefits of the confinement of women prisoners. Both de jure and de facto sex-based disparity has existed within the criminal justice system from arrest and sentencing procedures to incarceration and classification within the prisons.[4] However, the Fourteenth Amendment requires, even in the context of prison conditions, that any such disparity must "serve important governmental objectives" and must be "substantially related to achievement of those objectives." Craig v. Boren, 429 U.S. 190, 197, 97 S.Ct. 451, 457, 50 L.Ed.2d 397 (1976).

Applying this restrictive scrutiny to the prison context is difficult because of the pervasive differences between men's and women's institutions. The notion of separate institutions for male prisoners and female prisoners is itself a recent one, generally regarded as progressive. VCCW is typical of most women's prisons in its resemblance to a college campus and in the absence of physical restraints such as high walls and gun towers generally found at men's prisons. The relatively smaller prison population at VCCW compared to the major male prisons in Virginia allows for a better ratio of administrative personnel to prisoner, providing for additional security in the absence of the walls and guns. The smaller prison population and lighter security measures, however, make many of the programs offered at men's prisons impractical and unaffordable at VCCW. The advantages of such a cleaner, more bucolic atmosphere are balanced by such disadvantages as plaintiff's limited opportunities for recreation and education compared to those for men in "C" custody.

Plaintiff contends that the Fourteenth Amendment entitles her to conditions of confinement equal to those of "C" custody at male institutions. There is some support for her position in the recent cases of Glover v. Johnson, 478 F.Supp. 1075 (E.D.Mich. 1979) and Mitchell v. Untreiner, 421 F.Supp. 886 (N.D.Fla.1976). In Glover, supra, the district court found denials of equal protection by the State of Michigan in the lack of parity in educational and vocational programs and in library facilities between the men's and women's prisons. Finding such programs and facilities at the women's prison markedly poorer, the Court ordered the state to provide for programs and opportunities at the female institution comparable to those available to male inmates. Similarly, the district court in Mitchell v. Untreiner, supra, ordered county correctional officials to remedy the disparities in educational, recreational and visitation opportunities between those at an all-male facility and those available at the sub-standard mixed facility.

■ The evidence before the Court is insufficient at this stage to compel a ruling on plaintiff's equal protection claim. A further hearing must be held to determine the precise disparities of which plaintiff complains, the state's purpose in treating female inmates separately and differently than the men, and the relationship between that purpose and any disparity in the conditions of confinement in maximum security.

---

4. For a review of differences in treatment accorded male and female offenders, see S. Fabian, Toward the Best Interests of Women Prisoners: Is the System Working? 6 New Eng-land J. on Prison Law 1, 13–32 (1979); Comment, Womens Prisons: Laboratories for Penal Reform, 1973 Wis.L.Rev. 210, 219–27 (1973).

In an effort to guide the parties, however, the Court adds the following preliminary findings and conclusions:

 Many differences in treatment of inmates appear to be related to the relative size of VCCW compared to the major male institutions. The Court sympathizes with defendants who must deal with the fiscal reality that providing for a wide range of programs for a smaller number of prisoners entails a greater cost. However, such seemingly practical considerations may not be used to "justify official inaction or legislative unwillingness to operate a prison system in a constitutional manner." *Glover v. Johnson, supra* at 1078, *citing Gates v. Collier,* 501 F.2d 1291, 1319–20 (5th Cir. 1974).

 The Court finds further that valid concerns for institutional security at the minimum security VCCW may justify different conditions of confinement and opportunities for rehabilitation and education than those provided at the maximum security male prisons. As noted by the Court in *Barefield v. Leach*, No. 10282 (D.N.M.1974), "what the Equal Protection Clause requires in a prison setting is *parity of treatment, as contrasted with identity of treatment,* between male and female inmates. . . ." *Id.,* slip op. at 37–38 (emphasis added). A determination of parity will involve a review of the totality of prison conditions and rehabilitative opportunities at male prisons and at VCCW. Differences unrelated to such valid concerns as prison security must be remedied.

The Court applauds defendants' recent effort to upgrade the programs offered to inmates at VCCW and requests that defendants submit to the Court, prior to the hearing to be held in this matter, a detailed account of such changes to the end that all counsel will be in a position to assist the Court in fairly resolving plaintiff's equal protection claim.

An appropriate order shall issue.