UNITED STATES

v.

**Phyllis M. HOUSTON, 260 17 9337, Private First Class (E–2) U. S. Marine Corps.**

**NMCM 81 0286.**

U. S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 18 Sept. 1980.

Decided 22 Jan. 1982.

LCDR Stephen C. Baker, JAGC, USN, Appellate Defense Counsel.

LCDR W. A. Dorsey, JAGC, USNR, Appellate Government Counsel.

Before BAUM, Senior Judge, and ABERNATHY and KERCHEVAL, JJ.

BAUM, Senior Judge:

Appellant, a female Marine Private First Class, was convicted, pursuant to her pleas of guilty, of a short unauthorized absence and six specifications of possession, sale and transfer of marijuana, in violation of Articles 86 and 92, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 886, 892. The military judge sentenced appellant to a bad-conduct discharge, confinement at hard labor for three months, forfeiture of $290.00 per month for 3 months and reduction in grade to E–1. The convening authority approved the adjudged sentence but suspended portions of it, including the bad-conduct discharge, for one year from the date of that action, 23 October 1980. The convening authority also designated the Cumberland County Jail, Fayetteville, North Carolina, as the place of confinement for appellant and she, in fact, served her confinement in that jail. The supervisory authority approved the sentence as approved and partially suspended by the convening authority. The case is now before this Court for review with one error assigned, that:

APPELLANT WAS DENIED POST–TRIAL EQUAL PROTECTION OF THE LAW WHERE SHE WAS CONFINED SOLELY BECAUSE OF HER SEX IN A COUNTY JAIL LACKING A REHABILITATIVE PROGRAM AS EXTENSIVE AS THAT AFFORDED CONVICTED MALE SOLDIERS (sic) TRIED AND CONFINED AT CAMP LEJEUNE.

Appellant has submitted materials from the Camp Lejeune Correctional Facility which show a broad and extensive program for rehabilitation and restoration of male prisoners. The contrast between the program available at the Marine facility and that provided by the county is reflected in the following affidavit from appellant:

I served my confinement at Fayetteville (sic) County Jail located at 131 Dick St, Fayetteville, N. C. 28301. During my time in confinement, I was never offered any programs in rehabilitation even though I requested to participate in any rehabilitation programs the facility had to offer. I was told that the facility had no rehabilitation programs to offer and to the best of my knowledge the facility had no rehabilitation programs to offer to the woman (sic) confinees during my period of confinement.

Appellant asserts that she was denied the opportunity to participate in the rehabilitation program at the Camp Lejeune facility solely because she is a female, the correctional facility being limited to males only, pursuant to Naval directives which prohibit confinement of women in facilities with male members. The Government does not address the question whether, if there are valid reasons for not confining women in the same facility with male prisoners, at least one confinement facility with equivalent rehabilitation programs is available for the use of female Naval prisoners, rather than confining them in a civilian county jail.[1] Neither is there an explanation whether, in the alternative, provision could not have been made to transport appellant from the jail to Camp Lejeune during the day to participate in the correctional facility's rehabilitation programs and then return her to the county jail to be locked up at night, particularly since she was slated to return to duty with a suspended bad-conduct discharge upon completion of her confinement. Whatever the reasons, appellant argues that:

As a consequence of this distinction in confinement programs afforded each sex, female service members are *per se* prejudiced. This is so because, unlike their male counterparts, they return to their military duties after service of the confinement portion of their sentences without benefit of a rehabilitative program. Consequently, females with suspended punitive discharges are less well equipped

---

1. From our review of other cases, we believe such a facility is maintained by the Army at Fort Story, Virginia.

than males to avoid vacation of a suspended sentence.

■ The thrust of appellant's contention that she has been denied equal protection of the law as a result of the "rehabilitative disparity" between the Cumberland County Jail and the Camp Lejeune Correctional Facility has been mooted by the apparent successful completion of her probationary period. The probationary period expired on 23 October 1981 and this Court has not received any documents reflecting vacation of the suspended bad-conduct discharge, nor has it been asserted by appellant that the suspension has been vacated.

Despite the fact that there has been no showing that appellant has suffered the asserted prejudice from serving her sentence in a civilian jail, it is considered worthwhile to take a hard look at the state of the law with respect to whether such sex-based treatment violates constitutional guarantees of equal protection.

The current test applied in deciding whether a classification based on gender is violative of equal protection was formulated by the United States Supreme Court in *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), and was applied as recently as 1981 in *Michael M. v. Sonoma County Superior Court*, 450 U.S. 464, 101 S.Ct. 1200, 67 L.Ed.2d 437 (1981). A brief survey of the cases prior and subsequent to *Craig*, particularly *Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), and *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973), is important to provide a complete understanding of the analysis involved in determining whether a classification based on sex withstands constitutional muster.

Before *Craig*, the Supreme Court applied two distinct tests, commonly referred to as the "two-tier" approach, when scrutinizing whether a classification is constitutionally valid under either the Fourteenth Amendment's equal protection clause or the Fifth Amendment's due process clause.[2] *Craig* established a third test for challenges to sex-based classifications.

When the discrimination is against a "suspect classification" such as race,[3] national origin,[4] or alienage,[5] it will be subject to "strict judicial scrutiny," the first "tier" of equal protection analysis. These classifications are presumptively invalid, requiring the government to overcome the difficult burden of showing that the classification is necessary to accomplish a "compelling state interest." The extreme difficulty for the government to show such an interest is demonstrated by the fact that only twice has the Supreme Court upheld discrimination against "suspect classifications." These were the *Hirabayashi v. United States*, 320 U.S. 81, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943), and *Korematsu v. United States*, 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944), cases, which are particularly unique in that the persons discriminated against were of Japanese ancestry at a time when the United States was engaged in war with Japan. "Strict judicial scrutiny" also is applied when the classification affects a "fundamental right." The number of such rights, which include the right to

---

2. The equal protection clause of the Fourteenth Amendment is applicable only to the states and not to the federal government or its agencies. The guarantee of equal protection of the laws, however, is implicit in the due process clause of the Fifth Amendment. The same equal protection analysis, therefore, is employed whether the classification is made by a state or an agency of the federal government. *See, e.g., Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954); *United States v. Penn*, 4 M.J. 879, 881–82 (N.C.M.R.1978), citing *Schneider v. Rusk*, 377 U.S. 163, 168, 84 S.Ct. 1187, 1190, 12 L.Ed.2d 218 (1964). *See also United States v.*

*Sykes*, 11 M.J. 766, 768 (N.M.C.M.R.1981), in which this Court recently noted, citing *Mathews v. DeCastro*, 429 U.S. 181, 97 S.Ct. 431, 50 L.Ed.2d 389 (1976), that "[t]he Due Process Clause of the Fifth Amendment encompasses equal protection principles."

3. *See, e.g., Loving v. Virginia*, 388 U.S. 1, 87 S.Ct. 1817, 18 L.Ed.2d 1010 (1967).

4. *See, e.g., Oyama v. California*, 332 U.S. 633, 68 S.Ct. 269, 92 L.Ed. 249 (1948).

5. *See, e.g., Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971).

travel,[6] the right to vote,[7] the right of marriage and procreation,[8] and the right to privacy,[9] however, are severely limited for they must be "explicitly or implicitly guaranteed by the Constitution." *San Antonio Independent School District v. Rodriguez*, 411 U.S. 1, 33, 93 S.Ct. 1278, 1296, 36 L.Ed.2d 16 (1973).[10]

The second part of the Supreme Court's "two-tier" approach is the "rational basis test," applied when the different treatment is based on nonsuspect classifications or classifications not involving "fundamental rights"—generally in the areas of economics or social welfare. Almost any explanation for the classification offered by the government is upheld by the Supreme Court, for as stated by the Court in *McGowan v. Maryland*, 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961):

> Although no precise formula has been developed, the Court has held that the Fourteenth Amendment permits the States a wide scope of discretion in enacting laws which affect some groups of citizens differently than others. The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective. State legislatures are presumed to have acted within their constitutional power despite the fact that, in practice, their laws result in some inequality. A statutory discrimination will

not be set aside if any state of facts reasonably may be conceived to justify it. *Id.* at 425–26, 81 S.Ct. at 1104–05.[11]

The so-called "modern" gender-based equal protection cases begin with *Reed*, decided in 1971. Prior to *Reed*, the Supreme Court, apparently applying a "rational basis" analysis, rarely found that a classification based on sex violated equal protection. *See, e.g., Goesaert v. Cleary*, 335 U.S. 464, 69 S.Ct. 198, 93 L.Ed. 163 (1948) (statute prohibiting women from working as bartenders held not violative of equal protection); *Hoyt v. Florida*, 368 U.S. 57, 82 S.Ct. 159, 7 L.Ed.2d 118 (1961) (right of absolute exemption from jury duty granted to women held not violative of equal protection).[12] The Supreme Court in *Frontiero*, after stating that *Reed*'s "departure from 'traditional' rational-basis analysis with respect to sex-based classifications is clearly justified," *id.* 411 U.S. at 684, 93 S.Ct. at 1769, explained why the prior cases had permitted such discriminatory classifications:

> There can be no doubt that our Nation has had a long and unfortunate history of sex discrimination. Traditionally such discrimination was rationalized by an attitude of "romantic paternalism" which, in practical effect, put women, not on a pedestal, but in a cage. Indeed, this paternalistic attitude became so firmly rooted in our national consciousness that, 100 years ago, a distinguished Member of this Court was able to proclaim:

---

**6.** *See, e.g., Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

**7.** *See, e.g., Harper v. Virginia State Board of Elections*, 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966).

**8.** *See, e.g., Skinner v. Oklahoma*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942).

**9.** *See, e.g., Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973).

**10.** The Supreme Court refused to apply "strict judicial scrutiny" in its analysis of classifications affecting the right to education, for that right, in spite of its importance and close relationship with other rights protected by the Constitution, is not explicitly or implicitly protected by the Constitution. *See San Antonio Independent School District v. Rodriquez*, 411 U.S. 1, 35–38, 93 S.Ct. 1278, 1297–1299, 36 L.Ed.2d 16 (1973).

**11.** The Supreme Court in *McGowan v. Maryland, supra*, rejected the argument that Maryland statutes, which classified which commodities may or may not be sold on Sunday, violated the equal protection clause. This is a fairly typical example of a case involving economic issues and classifications in which the Court applied the "rational basis test."

**12.** Statutes discriminatorily classifying women were also unsuccessfully challenged under the privileges and immunities clause of the Fourteenth Amendment. In *Bradwell v. Illinois*, 83 U.S. (16 Wall.) 130, 21 L.Ed. 442 (1873), for example, an Illinois statute prohibiting women from practicing law was upheld by the Supreme Court when challenged as violating the privileges and immunities clause.

"Man is, or should be, woman's protector and defender. The natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life. The constitution of the family organization, which is founded in the divine ordinance, as well as in the nature of things, indicates the domestic sphere as that which properly belongs to the domain and functions of womanhood. The harmony, not to say identity, of interests and views which belong, or should belong, to the family institution is repugnant to the idea of a woman adopting a distinct and independent career from that of her husband....

"... The paramount destiny and mission of woman are to fulfil the noble and benign offices of wife and mother. This is the law of the Creator." *Bradwell v. Illinois*, 16 Wall. 141, 21 L.Ed. 442 (1873) (Bradley, J., concurring).

*Id.* at 411 U.S. 684–85, 93 S.Ct. at 1769 (footnote omitted).[13] *Reed* and later cases clearly reflect a recognition by the Supreme Court of a drastic change in this social outlook.

As stated above, *Reed*, was the first Supreme Court decision not to apply the "rational basis" test in determining whether a classification based on sex violates equal protection.[14] The Court in *Reed* invalidated an Idaho statute which preferred males over females in the administration of an intestate's estate. In arriving at its decision the Court first noted that "this Court has consistently recognized that the Fourteenth Amendment does not deny to States the power to treat different classes of persons in different ways," *id.* at 75 (citations omitted), but went on to state that "[t]he

Equal Protection Clause of that amendment does, however, deny to States the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute." *Id.* at 75–76. The Court went on to require that "[a] classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." *Id.* at 76, citing *Royster Guano Company v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 562, 64 L.Ed. 989 (1920).

*Frontiero* was the next important case in the development of the present test applied in analyzing sex-based equal protection cases. Although the Court in *Reed* clearly applied a test stricter than "rational basis," there was some confusion as to the degree of scrutiny *Reed* required.

In a plurality decision, the Supreme Court in *Frontiero* interpreted *Reed* as applying "strict judicial scrutiny" and held that such analysis was required when confronted with a classification based on sex. The Court reasoned that "classifications based upon sex, like classifications based upon race, alienage, or national origin, are inherently suspect, and must therefore be subjected to strict judicial scrutiny." *Id.* at 688, 93 S.Ct. at 1771. In applying "strict judicial scrutiny" the *Frontiero* Court held that the requirements under 37 U.S.C. §§ 401, 403, and 10 U.S.C. §§ 1072, 1076, which provide that a female member of the uniformed services must prove that her spouse was in fact dependent upon her for support in order to obtain increased allowances for quarters and medical and

---

**13.** Footnote 13 to this excerpt is also of historical interest:

13. Indeed, the position of women in this country at its inception is reflected in the view expressed by Thomas Jefferson that women should be neither seen nor heard in society's decisionmaking councils. See M. Gruberg, Women in American Politics 4 (1968). See also 2 A. de Tocqueville, Democracy in America (Reeves Trans. 1948).

*Frontiero v. Richardson*, 411 U.S. 677, 684, 93 S.Ct. 1764, 1769, 36 L.Ed.2d 583 (1973).

**14.** The Supreme Court, however, will apply a "rational basis test" when the classification tends to favor women. *See, e.g., Schlesinger v. Ballard*, 419 U.S. 498, 95 S.Ct. 572, 42 L.Ed.2d 610 (1975); *Kahn v. Shevin*, 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974).

dental benefits, while married male service-members automatically received these additional benefits, were violative of equal protection.

The Supreme Court did not long support its plurality opinion in *Frontiero* for it made clear in *Craig* that it would not apply "strict judicial scrutiny" in determining whether sex-based classifications are violative of equal protection.[15] In overturning an Oklahoma statute which prohibited the sale of 3.2% beer to males under the age of 21 and to females under the age of 18, the Court interpreted the earlier decisions as establishing "that classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives." *Id.* at 197, 97 S.Ct. at 457. In *Craig* the governmental objective alleged was traffic safety, but the Court, relying on *Reed,* found that the government's statistics supporting its argument that the challenged classification serves to achieve that objective could not withstand equal protection challenge. *Id.* at 200, 97 S.Ct. at 458.[16] Thus, the Court did not apply "strict judicial scrutiny" or the "rational basis test" but employed an "intermediate approach" in its analysis of the constitutionality of the challenged classification.

The test formulated in *Craig* is still in effect, and this "intermediate approach" has been applied as recently as 1981 in *Michael M. v. Sonoma County Superior Court, supra,* in which the Supreme Court, in an opinion delivered by Justice Rehnquist, concisely summarized the analysis to apply when gender-based classifications are challenged as being violative of equal protection. The Court stated:

As is evident from our opinions, the Court has had some difficulty in agreeing upon the proper approach and analysis in cases involving challenges to gender-based classifications. . . . [W]e have not held that gender-based classifications are "inherently suspect" and thus we do not apply so-called "strict scrutiny" to those classifications. See *Stanton v. Stanton,* 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975). Our cases have held, however, that the traditional minimum rationality test takes on a somewhat "sharper focus" when gender-based classifications are challenged. See *Craig v. Boren,* 429 U.S. 190, 210n, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976) (Powell, J., concurring). In *Reed v. Reed,* 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971), for example, the Court stated that a gender-based classification will be upheld if it bears a "fair and substantial relationship" to legitimate state ends, while in *Craig v. Boren, supra,* at 197, 97 S.Ct. 451, 50 L.Ed.2d 397, the Court restated the test to require the classification to bear a "substantial relationship" to "important governmental objectives."

*Id.* at 468–69, 101 S.Ct. at 1204.

The Supreme Court has therefore recognized a "middle tier" of analysis in cases where a gender-based classification is challenged on equal protection grounds. Indeed, it was this "intermediate approach" that was followed by our Court in *United States v. Sykes,* 11 M.J. 766 (N.M.C.M.R. 1981), in finding "that the gender based

---

**15.** In several cases decided between *Reed* and *Craig* the Supreme Court avoided the issue of what test to apply to sex-based classifications by concluding that the classification challenged was invalid under *any* test. *See, e.g., Weinberger v. Wiesenfeld,* 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975); *Stanton v. Stanton,* 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975). Furthermore, the Court in *Stanley v. Illinois,* 405 U.S. 645, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Cleveland Board of Education v. LaFleur,* 414 U.S. 632, 94 S.Ct. 791, 39 L.Ed.2d 52 (1974); and *Turner v. Department of Employment Security,* 423 U.S. 44, 96 S.Ct. 249, 46

L.Ed.2d 181 (1975), took the approach of finding the challenged classifications to be constitutionally impermissible "irrebuttable presumptions," thus avoiding the need to decide what equal protection analysis to apply to the sex-based classifications challenged in those cases.

**16.** The Supreme Court also rejected the Government's contention that the Twenty-First Amendment saves the statute from equal protection challenge. *Craig v. Boren,* 429 U.S. 190, 204–09, 97 S.Ct. 451, 460–63, 50 L.Ed.2d 397 (1976).

classification in the indecent assault offense serves important Governmental objectives and is substantially related to the achievement of those objectives." *Id.* at 768.[17]

The Supreme Court has not examined the question of whether equal protection requires women's prisons to afford its inmates the same rehabilitation programs as those provided inmates at all-male institutions. This precise issue, however, has been addressed in several federal decisions at the district court level. Those cases warrant examination:

(1) *Mitchell v. Untreiner*, 421 F.Supp. 886 (N.D.Fla.1976).

In 1976 the District Court for the Northern District of Florida, in an action brought on behalf of the inmates of Escambia County Jail, Pensacola, Florida, was presented with several alleged unlawful prison conditions from which the confinees sought relief.[18] One of the numerous violations noted by the court was that:

Inmates of the Escambia County Jail are being denied the equal protection of the laws guaranteed to them by the Fourteenth Amendment to the United States Constitution. By the mere coincidence of . . . their sex they are denied contact visitation and regular outdoor exercise, the opportunity to subscribe to a newspaper, to watch television, and *to contribute to their educational advancement*, all of which are provided to convicted male prisoners at the Escambia County Road Camp.

*Id.* at 895 (emphasis added). Thus, the court concluded that the denial of an opportunity for women prisoners "to contribute to their educational advancement," clearly a rehabilitation program, while male prisoners at the nearby men's prison received such benefits, was violative of equal protection. The court, however, failed to articulate its formula for reaching that conclusion.

(2) *Glover v. Johnson*, 478 F.Supp. 1075 (E.D.Mich.1979), and *Barefield v. Leach*, Civ. Act. No. 10282 (D.N.M. 1974).

The district court in *Glover* held that the State of Michigan must provide women inmates educational and vocational programs on a "parity" with those programs offered male prisoners. In upholding the plaintiffs' equal protection claim, the court rejected the State's argument that the unequal treatment was justified because the men's institution was much larger than the women's institution, thus making it impractical to offer the rehabilitation programs at the women's prison. The court took the economic considerations into account but stated that "these considerations alone cannot justify official inaction or legislative unwillingness to operate a prison system in a constitutional manner." *Id.* at 1078, citing *Gates v. Collier*, 501 F.2d 1291, 1319–20 (5th Cir. 1974); *Pugh v. Locke*, 406 F.Supp. 318, 330 (M.D.Ala.1976), *aff'd and remanded*, 559 F.2d 283 (5th Cir. 1977); *Holt v. Sarver*, 309 F.Supp. 362, 385 (E.D.Ark.1970).

In reaching its decision, the court in *Glover* followed the rationale employed by the federal district court in *Barefield*. The facts in *Barefield* were "remarkably similar" to those in *Glover* in that both cases involved women prisoners who alleged that they were denied equal protection of the laws because they were not provided the same vocational and educational rehabilitation opportunities as provided the male prisoners. *Glover v. Johnson, supra*, at 1078. The court in *Glover*, quoting *Barefield*, concluded that:

In this area of constitutional law, each suit must be approached with caution and disposed of on a case by case basis. In the final analysis, it is the facts as opposed to legal "tests" that control the court's decision. *A synthesis of these cases leads to the conclusion that what the Equal Protection Clause requires in a*

---

17. *Cf. United States v. Harris*, 8 MJ 52 (CMA 1979), which gave voice to the "inherently suspect" view from *Frontiero*.

18. "The action was brought pursuant to 42 USC §§ 1983, 1985 and 1986; the United States Constitution; and the laws of the State of Florida." *Mitchell v. Untreiner, supra* at 888.

*prison setting is parity of treatment, as contrasted with identity of.treatment, between male and female inmates with respect to the conditions of their confinement and access to rehabilitation opportunities.* The state can justify a lack of parity in treatment or opportunities when its actions have a fair and substantial relationship to the purpose of the inmate's incarceration.

*Id.* at 1079 (emphasis added by the *Glover* court).

The court in *Glover* expressly applied the test formulated in *Craig. Id.* at 1078. The Court also specifically found the *Barefield* court's reasoning to be "sound and fully consistent with *Craig v. Boren* . . .," *Id.* at 1079, despite the fact that *Barefield* was decided two years before *Craig* and that court found classifications based on sex to be "inherently suspect." *See id.* In providing guidance as to the meaning of the term "parity of treatment," the *Glover* court found that the state is required "to provide women inmates with treatment and facilities that are substantially equivalent to those provided the men—i.e., equivalent in substance if not in form—unless their actions, though failing to do so [when unequal rehabilitation facilities are involved], nonetheless bear a fair and substantial relationship to achievement of the State's correctional objectives." *Id.*

(3) *Batton v. State Government of North Carolina, Executive Branch,* 501 F.Supp. 1173 (E.D.N.C.1980).

**19.** Plaintiff's claim is stated by the court as follows:

Plaintiff's equal protection claim is based upon the admitted disparity between the conditions of confinement in maximum security at VCCW [Virginia Correctional Center for Women] and those at major male institutions in Virginia. The disparity consists of a more restricted freedom of movement among and interaction with the general prison population experienced by the women as opposed to the men. Defendants concede that, while the correctional guidelines make no distinction between male inmates and female inmates, some disparity results when those guidelines are put into effect at the different institutions.

The district court in *Batton* followed the holdings and rationale of *Barefield* and *Glover* in a 42 U.S.C. § 1983 action brought by women inmates incarcerated in two North Carolina prisons. One of the opportunities of which the women prisoners were allegedly deprived was vocational training, which was provided to the state's male inmates. The court specifically concluded "that the 'parity of treatment' standard provides instructive guidance for analyzing the specific equal protection claims plaintiffs have raised." *Id.* at 1177.

(4) *Bukhari v. Hutto,* 487 F.Supp. 1162 (E.D.Va.1980).

The court in *Bukhari* did not address the same issue—whether equal protection requires women prisoners to be afforded the same rehabilitation programs as their male counterparts—as the cases previously discussed.[19] Furthermore, the court was unable to make a ruling on the question presented.[20] Nevertheless, the language of the case supports the holdings and rationale of the other decisions discussed and provides some additional guidance.

The court first indicated its support for the application of the *Craig* standard in analyzing the constitutionality of disparities in treatment between men and women prisoners:

Equal protection challenges to sex-based disparity in prison conditions constitute a relatively new phenomenon, one which has subjected to review some traditional notions of the purpose and resulting benefits of the confinement of women

*Bukhari v. Hutto,* 487 F.Supp. 1162, 1171 (E.D. Va.1980).

**20.** There was insufficient evidence before the court:

The evidence before the Court is insufficient at this stage to compel a ruling on plaintiff's equal protection claim. A further hearing must be held to determine the precise disparities of which plaintiff complains, the state's purpose in treating female inmates separately and differently than the men, and the relationship between that purpose and any disparity in the conditions of confinement in maximum security.
*Bukhari v. Hutto, supra.*

prisoners. Both *de jure* and *de facto* sex-based disparity has existed within the criminal justice system from arrest and sentencing procedures to incarceration and classification within the prisons. [footnote omitted]. However, the Fourteenth Amendment requires, even in the context of prison conditions, that any such disparity must "serve important governmental objectives" and must be "substantially related to achievement of those objectives."

*Id.* at 1171, citing *Craig v. Boren, supra,* at 197. The court went on to favorably discuss *Glover* and *Mitchell, id.* at 1172, and then provided the following guidance:

The Court finds further that valid concerns for institutional security at the minimum security VCCW [Virginia Correctional Center for Women] may justify different conditions of confinement and opportunities for rehabilitation and education than those provided at the maximum security male prisons. ... A determination of parity will involve a review of the totality of prison conditions and rehabilitation opportunities at male prisons and at VCCW. Differences unrelated to such valid concerns as prison security must be remedied.

*Id.* at 1172. Thus, the court in *Bukhari* would recognize prison security as an important governmental objective and would uphold a disparity in treatment between male and female prisoners if such disparity is "substantially related to achievement of [that objective]." *Craig v. Boren, supra,* at 197.

The conclusion to be drawn from these cases is that the courts, when presented with the question of whether a disparity of treatment between men and women inmates as to rehabilitation programs violates equal protection, have ruled in the affirmative. The courts have not been impressed with the argument that the unequal treatment is justified due to economic considerations, *see Glover v. Johnson, supra; Bukhari v. Hutto, supra,* but at least one court has indicated that security may justify such a disparity of treatment under certain circumstances. *See Bukhari v. Hutto, supra.*

In light of these cases, and the theories upon which they are based, it is clear that, in a civilian context at least, there is substantial authority in support of appellant's assertion that she was denied equal protection of the law when, solely by reason of her sex, she was confined in a facility which lacked rehabilitation programs at least on a parity with those provided male prisoners. We do not reach the question of whether military necessity and economic considerations, when viewed in light of the substantially lesser proportion of women to total military, as opposed to civilian, populations, dictates a dissimilar result in a court-martial context, for, as stated earlier, we find no prejudice to appellant since she has successfully completed her probationary period. We are able to affirm the sentence in this case, but, depending upon the facts, such may not be accomplished in future cases of this nature.

The findings and sentence as approved and partially suspended below are affirmed.

Judge ABERNATHY and Judge KERCHEVAL concur.