**ASHANN–RA, Plaintiff,**

**v.**

**COMMONWEALTH OF VIRGINIA**
*et al.*, **Defendants.**

No. Civ. A. 7:99cv00915.

United States District Court,
W.D. Virginia,
Roanoke Division.

Aug. 22, 2000.

---

Ashann–Ra, Red Onion State Prison, Pound, VA, pro se.

Pamela Anne Sargent, Office of the Attorney General, Richmond, VA, for defendants.

TURK, District Judge.

Plaintiff Ashann–Ra, a Virginia inmate proceeding *pro se*, brings this action under the Civil Rights Act, 42 U.S.C. § 1983, with jurisdiction vested under 28 U.S.C. § 1343. In his complaint, Ashann–Ra (hereinafter "Ra") alleges that the defendant correctional officers at Red Onion State Prison (ROSP) failed to provide him with well-fitting shoes, in violation of the Eighth Amendment and state tort laws;

violated his constitutional and state law rights to privacy while showering; and implemented and enforced a grooming policy that violates equal protection, due process and various state law rights. The defendants have filed a motion for summary judgment to which plaintiff has responded with a motion for partial summary judgment. Although several motions to amend and a discovery matter are also pending, these motions can be addressed in conjunction with the summary judgment motions. Accordingly, the court finds the motions ripe for disposition.

Upon motion for summary judgment, the court must view the facts, and the inferences to be drawn from those facts, in the light most favorable to the party opposing the motion. *Ross v. Communications Satellite Corp.*, 759 F.2d 355 (4th Cir.1985). Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Federal Rule of Civil Procedure 56(c). When a motion for summary judgment is made and properly supported by affidavits, depositions, or answers to interrogatories, the non-moving party may not rest on the mere allegations or denials of the pleadings. Instead, the non-moving party must respond by affidavits or otherwise and present specific facts showing that there is a genuine issue of disputed fact for trial. Fed.R.Civ.P. 56(e). If the non-moving party fails to show a genuine issue of fact, summary judgment, if appropriate, may be entered against the non-moving party.

### Claim 1: Denial of Well-fitting Shoes

In his first claim, Ra alleges that defendants Stiltner, Turner and Fleming unreasonably deprived him of shoes that fit his feet. In support of this claim, Ra alleges the following sequence of facts. When Ra arrived at ROSP in December 1998, offi-cials issued him a pair of black canvas, slip-on shoes, size 11. Ra asserts that his proper shoe size is 12 or 13 and that the size 11 shoes did not fit. Although Ra repeatedly asked for replacement boots in a larger size, Defendant Fleming told Ra that no size 12 or 13 shoes were available, but that these larger sizes had been ordered.[1] For 24 days, Ra had to wear shoes that left his feet sticking out by 2–3 inches, in subfreezing weather, rain, and snow 2–3 inches deep. Ra's own state boots were kept in the laundry during this period, but Fleming would not allow him to wear those boots even temporarily until his larger, canvas shoes arrived. The Regional Administrator ruled that Ra's appeal from the warden's denial of his grievances about the shoes was founded. Ra alleges that wearing the wrong-sized shoes caused him pain and suffering, numbness and discomfort, and that the stress of these discomforts aggravated his known mental health problems.

■ The Eighth Amendment protects prisoners from cruel and unusual living conditions. *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). In order to state a claim of constitutional significance regarding prison conditions, a plaintiff must allege facts demonstrating that the challenged conditions resulted in a deprivation of a basic human need that was objectively "sufficiently serious" and (2) that, subjectively, the defendant prison officials acted with a sufficiently "culpable state of mind" with regard to the conditions. *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). To satisfy the objective element of a conditions claim, the plaintiff must show that he has sustained a serious or significant mental or physical injury as a result of the challenged conditions, *see Strickler v. Wa-*

---

1. Defendants offer evidence that the order for additional, large sized shoes was placed even before Ra arrived at ROSP, to replace the prison's stock of such shoes that had been depleted in the months since the prison opened in August 1998. Defendants cannot verify from their records exactly what size shoes Ra received upon his arrival on December 1, 1998. They do, however, document that Ra submitted his first grievance about the wrong-sized shoes on January 26, 1999, after he had received a pair of shoes that fit.

*ters,* 989 F.2d 1375, 1380–1381 (4th Cir. 1993).

■ To satisfy the subjective element of a conditions claim, plaintiff must show that the defendant officials acted with deliberate indifference toward the risk of harm. *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). To prove deliberate indifference by an official, plaintiff must show that the official was aware of facts from which he could draw an inference that a substantial risk of harm existed and that he actually drew that inference. *Id.* at 837, 114 S.Ct. 1970. Then, plaintiff must show that the official disregarded the risk by failing to take "reasonable measures" to alleviate the risk. *Id.* at 832, 114 S.Ct. 1970.

■ The court finds that Ra has not alleged facts indicating that he suffered any serious physical injury to his feet or any other part of his body as a result of defendants' failure to provide him with well-fitting shoes for 24 days. He does not allege that exposure of his feet to sub-freezing temperatures, rain or snow during the brief walks between buildings caused severe pain, disfigurement or life-threatening risks. *Strickler,* 989 F.2d at 1380–1381. Moreover, Ra has not alleged facts indicating that the defendants exhibited deliberate indifference in failing to provide him with properly fitting shoes more quickly. Ra does not document any requests he made to the defendants for properly sized canvas shoes. Moreover, Ra does not dispute defendants' evidence that as soon as larger sized shoes arrived on reorder, Ra received a pair. Ra complains that defendants could have allowed Ra to wear his own state boots for 24 days until canvas shoes arrived to fit him and that their failure to do so aggravated his mental health problems. However, Ra alleges no facts supporting his bald assertion that stress from wearing the small shoes made his mental health problems worse. Even if he could show such a connection, the court finds absolutely no allegation or evidence indicating that the defendants had any reason to believe that a few weeks without properly fitting shoes presented a serious risk of physical or mental health injury to Ra.[2] *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970. As to Claim 1, the court concludes that defendants are entitled to summary judgment as a matter of law and, therefore, denies plaintiff's motion for summary judgment as to this claim.

Ra also raises a state law claim of negligent infliction of emotional distress arising from defendants' delay in providing properly fitting boots. Inasmuch as the court grants summary judgment as to the federal law claim arising from these allegations, the court declines to exercise supplemental jurisdiction over Ra's state law claim and dismisses it without prejudice. *See* 28 U.S.C. § 1367(c).

### Claim 2: Denial of Privacy

Ra alleges that for 10½ weeks of his incarceration in the general population at ROSP, the shower stalls had no shower curtains and female correctional officers working daily in the control booth and on the floor had an unobstructed view of his genitals while he showered. Ra alleges that during the period when his unit had no shower curtains, several female officers viewed his genitals and encouraged him to masturbate while he was showering. He alleges that this practice put him at risk of contracting diseases such as hepatitis from exposure to semen discharged on the floor of the showers. He further alleges that the female officers, to cover up their own wrongdoing, regularly charged masturbating inmates with indecent exposure. Ra also alleges that the lack of shower curtains allowed inmates known to be predatory homosexuals to stalk other inmates in the showers and led to at least one other

---

**2.** The court does not find any grievances concerning the alleged aggravation of Ra's mental health problems stemming from his being forced to wear ill-fitting shoes for over three weeks. *See* 42 U.S.C. § 1997e(a)(inmate must exhaust administrative remedies in prison before bringing civil action).

inmate's being assaulted. Ra alleges that his mental distress over all these problems caused him to become sexually dysfunctional.

Ra asserts that the lack of shower curtains in 1998 and 1999 violated his right to privacy under the Eighth and Fourteenth Amendments. In support of these claims, he cites *Lee v. Downs,* 641 F.2d 1117 (4th Cir.1981). He also raises state law claims of negligent invasion of privacy and intentional and negligent infliction of emotional distress. In his original complaint, Ra sues former Warden Deeds, J. Armentrout and R. Rowlette in their official and personal capacities as the policymakers allegedly responsible for the decisions to open the prison without shower curtains and to schedule female officers to work in areas where they could view the genitals of showering male inmates.

Defendants offer the following evidence. For undisclosed security reasons, ROSP general population units were not designed for shower curtains or doors when the prison opened in August 1998 and had no curtains or doors at the time Ra arrived at ROSP, on December 1, 1998. The segregation unit showers were designed with metal mesh doors providing privacy for the inmate while allowing officers generally to observe the inmate in the shower. Defendants do not dispute Ra's allegations that administrators scheduled female officers to work in the control booth and on floor patrol in the general population units and that these officers could view the genitals of showering male inmates. After several inmates complained about the lack of privacy in the showers, the administration ordered curtains for the shower stalls. Officials obtained a shower curtain design from Keen Mountain Correctional Center and ordered material for curtains in April 1999. They began installing the curtains in Ra's general population housing unit

during the last week of October 1999. It is undisputed that all general population unit showers at ROSP now have shower curtains that shield inmates' genitals from officers' view.[3]

Defendants argue that Ra's § 1983 claims fail because he has not shown any injury. 42 U.S.C. § 1997e(e). Defendants also argue that in their official capacities, they are not persons subject to suit under § 1983 and that in their individual capacities, they are entitled to qualified immunity. Finally, they argue that Ra's state law claims are barred from federal review because the defendants are immune from suit and because Ra has not complied with the prerequisites under the Virginia Tort Claims Act for filing a court action.

## A. Privacy Claims under § 1983

■ The court agrees that as to Ra's § 1983 privacy claims against the defendants in their official capacities, defendants are entitled to summary judgment as a matter of law. *See Will v. Michigan Dep't of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)(state or officials acting in official capacity are not persons under § 1983). However, sued in their personal capacities, defendants are subject to Ra's suit under § 1983. *Hafer v. Melo,* 502 U.S. 21, 112 S.Ct. 358, 116 L.Ed.2d 301 (1991).

■ Public officers are entitled to qualified immunity from claims for monetary damages if they can prove that their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have been aware. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The test for determining whether qualified immunity is present requires three distinct inquiries: identification of

**3.** Defendants offer undisputed evidence that for several short periods of time in December 1998 and 1999, Ra was housed in the segregation unit. Apparently, defendants believe that Ra is raising an equal protection claim

concerning the difference in showers in the segregation and general population units. The court does not identify any equal protection claim in Ra's pleadings related to the showers.

the specific right allegedly violated, analysis of whether that right was so "clearly established" that a reasonable officer would have understood its constitutional dimensions, and determination of whether a reasonable officer would in fact have believed that his conduct fit within those constitutional parameters. *Gooden v. Howard County*, 917 F.2d 1355 (4th Cir. 1990), *different result reached on reh., en banc*, 954 F.2d 960 (1992).

 It is undisputed that inmates retain certain rights of privacy under the Constitution which include the right not to be viewed naked by a member of the opposite sex when not reasonably necessary. *See Lee v. Downs*, 641 F.2d 1117, 1120 (4th Cir.1981). However, the Constitution does not mandate that prisons which house prisoners convicted of serious crimes must be completely free of discomfort and affronts to a person's dignity. *See Johnson v. Pa. Bureau of Corrections*, 661 F.Supp. 425, 430 (W.D.Pa.1987), *citing Rhodes v. Chapman*, 452 U.S. 337, 349, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Crossgender supervision passes constitutional muster if it meets the test for constitutionality of prison regulations articulated in *Turner v. Safley*, 482 U.S. 78, 89–91, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). That test essentially requires that when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. *Id.* at 89, 107 S.Ct. 2254.

Many courts which have considered the question have held that a male inmate's constitutional rights are not violated when a female guard is permitted to view his genitals on a limited basis. *See Timm v. Gunter*, 917 F.2d 1093, 1101–02 (8th Cir. 1990) (minimal intrusions on privacy outweighed by institutional concerns for safety and equal employment opportunity), *cert. denied*, 501 U.S. 1209, 111 S.Ct. 2807, 115 L.Ed.2d 979 (1991); *Michenfelder v. Sumner*, 860 F.2d 328, 333–34 (9th Cir. 1988) (infrequent or casual observation or observation at a distance does not warrant

court interference); *Grummett v. Rushen*, 779 F.2d 491, 496 (9th Cir.1985) (inmates' privacy needs outweighed by internal security needs and equal employment opportunities); *Riddick v. Sutton*, 794 F.Supp. 169 (E.D.N.C.1992) (limited exposure of genitals to female officers not unconstitutional). However, routinely or regularly exposing an unclothed inmate to female guards may constitute a constitutional violation. *See Cumbey v. Meachum*, 684 F.2d 712 (10th Cir.1982) (as a general rule, violation of prisoners' right to privacy occurs when guards regularly watch inmates of opposite sex who are engaged in personal activities, such as showering); *Miles v. Bell*, 621 F.Supp. 51 (D.Conn.1985) (same). To determine whether an inmate's constitutional rights have been violated due to the regularity or scope of encounters between female officers and naked male inmates an evidentiary hearing may be required. *See Hudson v. Goodlander*, 494 F.Supp. 890 (D.Md.1980).

 In this case, there is no dispute that female correctional officers were routinely assigned to work the control booths with some view of the showers and that the showers had no curtains for several months during Ra's incarceration at ROSP. Ra also alleges that female officers patrolled the floor areas immediately adjacent to the showers. Plaintiff has also alleged that, from these positions, the female correctional officers could and did regularly view his genitals and other private areas of his body while he showered. The court concludes that these allegations state a constitutional claim of invasion of privacy. *See Lee*, 641 F.2d at 1120. At this stage of the proceedings, the court is unable to hold that the defendants reasonably believed that they were not violating one of the plaintiff's "clearly established" constitutional rights when they were confronted with the situation of female correctional officers being in a position to view inmates showering. *See Harlow*, 457 U.S. at 818, 102 S.Ct. 2727. As a result, the court finds that defendants are not entitled

to summary judgment on grounds of qualified immunity.

■ Defendants also argue that Ra's § 1983 privacy claim is barred under § 1997e(e). This provision, enacted as part of the Prison Litigation Reform Act of 1996, reads as follows:

No federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury.

The United States Court of Appeals for the Fourth Circuit, the majority of the other Circuit Courts of Appeals and the United States Supreme Court have not yet addressed the exact scope of § 1997e(e). This court need not do so here. However, the court finds simply that § 1997e(e) bars Ra's federal claims arising from the lack of shower curtains for several months.

As relief in the shower curtain claims, Ra specifically seeks to recover nominal and punitive damages for only two types of injuries: emotional distress and sexual dysfunction allegedly caused by the emotional distress. The court finds that these harms, both resulting from Ra's personal reaction to the challenged prison living condition, are precisely the type of harms for which § 1997e(e) bars suit. Ra specifically alleges that his dysfunction arose directly from his emotional distress and not the other way around. The court cannot find that such psychosomatic conditions qualify as "physical injury" of a sort entitling an inmate to bring suit under § 1997e(e) for damages for the underlying emotional distress. As Ra has not alleged any prerequisite physical injury from which his emotional distress arose, the court finds that all of his claims for monetary relief are barred under § 1997e(e).[4] Accordingly, the court grants summary

judgment on behalf of defendants as to Ra's § 1983 privacy claims.

Section 1997e(e) might also bar Ra's suit as to several of Ra's other claims regarding hazardous conditions created by the lack of shower curtains. However, the court finds that defendants are also entitled to summary judgment on the merits of these claims. Although Ra complains about safety problems generally, he does not allege any facts indicating that he contracted, or stood a substantial risk of contracting, hepatitis or any other life-threatening disease from contact with infected semen on a shower floor. Thus, he has not shown a serious enough harm or risk of future harm to state an Eighth Amendment claim. *Helling v. McKinney,* 509 U.S. 25, 31, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993); *Strickler v. Waters,* 989 F.2d 1375, 1380–1381 (4th Cir.1993). Ra also does not allege that any homosexual inmates stalked him in the showers or that he was involved in any of the alleged fights. He can bring a § 1983 action only for constitutional violations that he himself has suffered. *See Inmates v. Owens,* 561 F.2d 560, 562–63 (4th Cir.1977). Accordingly, the court grants summary judgment on behalf of the defendants as to Ra's Eighth Amendment claims that lack of shower curtains put him at risk of contracting disease or being assaulted by homosexual inmates.

Ra also alleges an Eighth Amendment claim that his emotional distress over the alleged shower conditions generally caused him to become sexually dysfunctional. However, Ra does not allege that any of the defendants knew facts from which they could draw an inference that the lack of shower curtains, combined with the exposure of inmates' genitals to female officers, could cause substantial risk of this type (or any type) of physical injury. *Farmer,* 511 U.S. at 837, 114 S.Ct. 1970. Accordingly,

---

4. It is undisputed that Ra's genitals are now hidden from view by a curtain while he is showering. As Ra, therefore, cannot seek injunctive or declaratory relief in this case, the court does not address whether § 1997e(e) would bar a similar suit seeking these types of relief.

Ra's Eighth Amendment claims fail because he does not allege facts demonstrating deliberate indifference on the part of the defendants. *Id.* Finding no genuine issue of material fact in dispute, the court grants defendants' motion for summary judgment as to Ra's Eighth Amendment claims relating to shower conditions.

Finally, the court grants summary judgment as to Ra's apparent due process claim that female officers "entrapped" inmates by urging them to masturbate in the shower and then bringing disciplinary charges against them for indecent exposure. Again, Ra complains about these actions generally, but does not allege that any female officer charged him with indecent exposure for masturbating in front of her in the shower. Accordingly, these allegations fail to state any claim actionable under § 1983. *Owens,* 561 F.2d at 562–63.

Ra raises several state law claims related to the lack of shower curtains. However, inasmuch as the court herein disposes of all Ra's federal claims, the court declines to exercise supplemental jurisdiction over his state law claims. *See* 28 U.S.C. § 1367(c). The court will dismiss these claims without prejudice, leaving Ra free to pursue them in state court if he so desires.

### Claim 3: Grooming Policy

On November 15, 1999, the Virginia Department of Corrections (VDOC) implemented Departmental Operating Procedure 864 (hereinafter DOP 864) setting forth new personal grooming standards for all inmates, male and female, who are incarcerated in state correctional facilities. The policy covers hair care, hair style, beards, mustaches, fingernails and general hygiene. Defendants assert that this grooming policy, modeled after a similar policy implemented by the South Carolina Department of Corrections in August of 1997, was designed to promote safety, security and sanitation and to facilitate the identification of inmates. DOP 864 directs that male inmates must keep their hair no more than one inch in depth and thickness.

Male inmates may not wear beards, goatees or sideburns below the middle of the ear unless they obtain an order from medical staff exempting them from shaving. Mustaches must be neatly trimmed and may not extend beyond the corner of the mouth or over the lip. Men who get a no-shave order from medical staff must keep their facial hair trimmed to one half inch in length or shorter. DOP 864 prohibits male inmates from wearing such hair styles such as braids, plaits, dreadlocks, cornrows, ponytails, buns, mohawks, partially shaved heads, designs cut into the hair and any style which could conceal contraband.

DOP 864 requires female inmates in VDOC institutions to keep their hair neatly cut, no longer than shoulder length. They may wear one or two braids or pony tails, but must keep their hair out of their eyes. Bangs must be trimmed above the eyebrows. The policy prohibits female inmates from sporting mohawks, "tailed" haircuts, shaved or partially shaved heads, more than two braids/plaits/ponytails, dreadlocks, cornrows, designs cut into the hair, or any hair style which could conceal contraband.

Defendants assert that inmates' failure to comply with the DOP 864 standards could pose a security risk, a health hazard or identification difficulties. Accordingly, prison officials are to manage all inmates who refuse to comply or chronically fail to comply with the DOP 864 standards as potential risks to institutional order and safety. Inmates who refuse to cut their hair, beards and/or fingernails or to alter their hair style to comply with the specifications of this procedure will be given an order to do so and if the inmate continues to refuse to comply, he or she will be charged with a violation of Major Offense Code 201, disobeying a direct order, and placed on pre-hearing detention. These inmates will remain assigned to special housing and all visitation, telephone privileges (except legal), commissary, work and program activities will be suspended until

the inmate fully complies with the grooming standards. If an inmate is three times convicted of 201 violations for failing to comply with DOP 864, that inmate will be referred to the Institutional Classification Authority for assignment to segregation, possible reclassification to a higher security level institution and a reduction in good time/earned sentence credit class level. No inmate will be released to a general population setting, or have his privileges restored (visitation, telephone calls, commissary, work and program activities), until he/she complies with grooming standards.

Defendants assert that VDOC officials implemented DOP 864 in response to numerous specific and potential instances in which long hair, specific hair styles and beards created security and health risks to staff, other inmates and to the individual inmate himself. In support of these assertions, defendants list a number of case histories of male inmates in VDOC institutions over the past 20 years. On several occasions, officials have found contraband or a weapon hidden in a male inmate's hair. Clearly, longer hair provides inmates with additional space in which to hide contraband. Defendants also assert that inmates use hairstyles to symbolize gang activity, placing staff and other inmates at serious risk. Defendants also assert that shorter hairstyles are easier to search, saving staff members' time and increasing their safety during routine searches of inmates. Defendants aver that the prohibition of dreadlocks specifically prevents health risks to staff members during searches because some inmates used hazardous substances such as feces to bind their dreadlocks. Some anecdotes concern inmates whose hair styles, sometimes combined with poor hygiene habits, have harbored insects or hidden or fostered skin problems. These conditions present a health risk to the inmate himself and to others. Long hair styles prevent inmates in work crews from fitting their hard hats and safety glasses properly and present a safety hazard when the inmate is using various machinery. A final, important purpose defendants put forward in support of DOP 864 is enhancement of positive identification of each inmate, to prevent escape and to assist in rearrest in the event of escape. They offer one anecdote about a male inmate who nearly escaped from a VDOC institution in 1987 by cutting his hair and beard to pose as a chapel volunteer.

Ra challenges the validity of the grooming policy on several grounds, seeking injunctive and declaratory relief, as well as compensatory, nominal and punitive damages. First, he asserts that DOP 864–6.0 violates due process because it does not clearly define the hairstyles prohibited. Ra asserts that this vagueness leaves staff members free to make their own interpretations of the policy requirements and to discipline inmates for styles that might actually be acceptable. On the other hand, he contends, the vague standard does not notify inmates of the precise changes they must make in order to comply with the standard and avoid discipline. In a similar vein, Ra complains that no administrator has ever explained the policy to inmates who cannot read or speak English, leaving such inmates dependant on security staff's interpretation of compliance.

 The court cannot find that Ra has standing to challenge the clarity of the regulation's definitions. He does not allege facts indicating that he cannot read the policy or that he sought to keep a hair style that was not clearly covered by DOP 864 prohibitions. Ra states that he is African American and that in November and December 1999, he had coarse, kinky hair that hung halfway to his shoulders which could be put into two pony tails, braids or plaits. In the days immediately after officials announced on November 15, 1999 that the policy would take effect December 15, 1999, staff members warned Ra that he would have to cut his hair. The court finds no arbitrariness in staff's warning, as Ra's hair style clearly violated the

no pony tail rule and the one inch depth rule of DOP 864. As Ra does not demonstrate that the vagueness of the DOP or the lack of administrative explanations deprived him personally of due process, *Owens*, 561 F.2d at 562–63, the court finds that he has no standing to pursue these claims.

When inmates tried to file grievances to stop implementation of the policy, officials responded that an inmate had nothing to grieve until the policy had actually been enforced against him. Ra apparently alleges that this practice was a misapplication of VDOC grievance procedures and that defendants purposely and wrongfully made the policy nongrievable until after the policy had been implemented to prevent inmates from bringing a federal civil action. *See* 42 U.S.C. § 1997e (requiring inmates to exhaust prison administrative remedies before bringing federal civil action concerning prison conditions). The court finds no constitutional violation here.

 Inmates do not have a constitutionally protected right to a grievance procedure. *Adams v. Rice*, 40 F.3d 72 (4th Cir.1994) and *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir.1991). Because a state grievance procedure does not confer any substantive right upon prison inmates, a prison official's failure to comply with the state's grievance procedure is not actionable under § 1983. *Mann v. Adams*, 855 F.2d 639, 640 (9th Cir.1988), *cert. denied*, 488 U.S. 898, 109 S.Ct. 242, 102 L.Ed.2d 231 (1988); *Azeez v. De Robertis*, 568 F.Supp. 8, 9–11 (N.D.Ill.1982). Moreover, because state grievance procedures are separate and distinct from state and federal legal procedures, an institution's failure to comply with state grievance procedures does not compromise its inmates' right of access to the courts. *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir.1991). Under these principles, Ra's complaints, that defendants misapplied the grievance procedure by refusing to accept grievances about a policy that had not yet been enforced, fail to state any deprivation of constitutionally protected rights. Furthermore, he cannot show that defendants' alleged misuse of the grievance procedure prevented him from filing a motion for temporary restraining order with this court concerning the policy or prevented him from pursuing this lawsuit. Accordingly, he fails to show any respect in which defendants' actions related to the grievance procedure affected his right to access the courts. *See Lewis v. Casey*, 518 U.S. 343, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996).

 Ra also challenges the procedure suspending inmates' privileges immediately after they are charged with violating a direct order to comply with DOP 864, without the inmate's having had the benefit of a hearing. The court finds no due process problem here. The due process clause mandates procedural safeguards before an inmate may be punished by conditions dramatically different from the range of restraint contemplated by his sentence. *See Sandin v. Conner*, 515 U.S. 472, 483, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995)(liberty interest created by state prison regulations only where case presents "a dramatic departure from the basic conditions" of inmate's indeterminate sentence). However, where deprivation of a state-created privilege and/or status does not "impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," federal due process rights are not implicated. *Sandin*, 515 U.S. at 483, 115 S.Ct. 2293. Ra has not alleged facts indicating that a temporary suspension of privileges for administrative reasons, such as a lockdown, represents a dramatic departure from the ordinary conditions of prison life. Accordingly, his complaint that his privileges were suspended without a hearing upon his noncompliance with DOP 864 fails to state any federal due process claim.

In his primary challenge to DOP 864, Ra complains that the policy treats men and women differently for no acceptable reason. While men must keep their hair one inch in depth or thickness, women may

wear their hair shoulder length. Although neither gender may wear dreadlocks or cornrows, women may wear two braids, plaits or pony tails, but men may not. He asserts that defendants could, and should be required to, implement a much less restrictive policy to achieve the same goals by allowing both men and women to wear hair styles such as braids, plaits or pony tails so long as the hairstyle exposes 30 to 40 percent of the scalp.

The equal protection clause of the Fourteenth Amendment provides that "No state shall ... deny to any person within its jurisdiction the equal protection of the laws." Courts have interpreted the clause to require that when a regulation undertakes to define a class of persons to be treated differently in some respect, the classification and the difference in treatment must be related·to the purpose of the regulation. *See United States v. Virginia,* 518 U.S. 515, 531–33, 116 S.Ct. 2264, 135 L.Ed.2d 735 (1996)(hereinafter "*VMI*")(holding the males-only admissions policy of Virginia Military Institute (VMI) violative of Equal Protection); *Reed v. Reed,* 404 U.S. 71, 75–76, 92 S.Ct. 251, 30 L.Ed.2d 225. (1971). Courts have also identified varying levels of governmental justification, depending on the nature of the class. Discrimination on the basis of race or national origin is subject to strict judicial scrutiny, while classifications based on economic factors or nonsuspect classes receive rational basis scrutiny. *West v. Virginia Dep't of Corrections,* 847 F.Supp. 402, 405 (W.D.Va.1994). Parties who seek to defend gender-based government action must demonstrate an "exceedingly persuasive justification" for the difference in treatment. *VMI,* 518 U.S. at 531–33, 116 S.Ct. 2264. When men and women are treated differently, the state must satisfy an intermediate level of judicial scrutiny by showing "at least that the [challenged] classification serves 'important governmental objectives and that the discriminatory means employed' are 'substantially related to the achievement of those objectives.'" *Id., quoting Mississippi Univ. for Women,*

458 U.S. 718, 724, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982)(quoting *Wengler v. Druggists Mut. Ins. Co.,* 446 U.S. 142, 100 S.Ct. 1540, 64 L.Ed.2d 107, (1980)). "The justification must be genuine, not hypothesized or invented post hoc in response to litigation. And it must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females." *VMI,* 518 U.S. at 533, 116 S.Ct. 2264. *See also Weinberger v. Wiesenfeld,* 420 U.S. 636, 643, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975); *Califano v. Goldfarb,* 430 U.S. 199, 223–224, 97 S.Ct. 1021, 51 L.Ed.2d 270 (1977) (STEVENS, J., concurring in judgment). Savings in time, money and effort do not justify gender-based discrimination. *Califano,* 430 U.S. at 217, 97 S.Ct. 1021.

■ Defendants contend that the gender differences within the grooming policies of DOP 864 are constitutional because Ra is treated like every other inmate at ROSP and because the DOP restrictions are rationally related to legitimate penological interests of security, hygiene and easier identification of inmates. *See Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987)(holding that prison regulation withstands constitutional challenge if regulation is reasonably related to legitimate penological interest); *Washington v. Harper,* 494 U.S. 210, 233, 110 S.Ct. 1028, 108 L.Ed.2d 178 (1990). However, neither *Turner* nor *Washington* held that this rational basis test would apply to a prison regulation that differentiated between classes of inmates on the basis of race, national origin or gender. Applying the rational basis test to all inmates' equal protection claims would allow the state to house inmates of one gender (or race or national origin) separately, treating them more harshly, and/or denying them a multitude of beneficial programs and policies, all on the basis of nothing more than economic efficiency. Neither the United States Supreme Court nor the United States Court of Appeals for the Fourth Circuit has yet addressed the issue of gen-

der-based class distinctions in state prison regulations. This court and the United States District Court for the Eastern District of Virginia have both ruled, however, that claims of gender discrimination under prison regulations must be analyzed using intermediate scrutiny. *See West v. Virginia Dep't of Corrections*, 847 F.Supp. 402, 407 (W.D.Va.1994)(holding that Virginia violated equal protection by providing male inmates only with a beneficial sentencing option to elect to enter boot camp); *Bukhari v. Hutto*, 487 F.Supp. 1162 (E.D.Va. 1980). The court rejects the defendants' argument for rational basis scrutiny of gender classifications in prison regulations and finds that such regulations must withstand intermediate scrutiny to survive an Equal Protection challenge.

At the same time, the court understands that it must show some degree of deference to the expertise of prison officials regarding matters of prison administration, *see Bell v. Wolfish*, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); *see also Block v. Rutherford*, 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984). For guidance in applying the VMI standard in the prison context, the court looks to *West* and *Bukhari*. In *Bukhari*, the United States District Court for the Eastern District of Virginia noted that "what the Equal Protection Clause requires in a prison setting is parity of treatment, as contrasted with identity of treatment, between male and female inmates." 487 F.Supp. at 1172. The *Bukhari* court required review of the totality of prison conditions to determine whether parity exists, and directed that "[d]ifferences unrelated to such valid concerns as prison security must be remedied." *Id. See also Pitts v. Thornburgh*, 866 F.2d 1450 (D.C.Cir.1989)(policy housing long-term D.C. female inmates in West Virginia did not violate Equal Protection even though similarly situated male inmates were housed nearer to D.C. because differing treatment based on need to respond to severe overcrowding in D.C. facilities and not on outmoded conceptions of role of women in contemporary society).

The court concludes that defendants' evidence in support of DOP 864 is sufficient to defeat Ra's Equal Protection challenge under intermediate scrutiny. First, the majority of the DOP provisions apply with parity to both men and women. *Bukhari*, 487 F.Supp. at 1172. All inmates must comply with limitations in their grooming habits and all face stiff sanctions for noncompliance. No inmate enjoys freedom of choice in hairstyle or hair length. Second, defendants do demonstrate that the provisions of the DOP which do treat male and female inmates disparately—that require men to wear their hair shorter and prohibit them from wearing ponytails——are substantially related to important penological interests. *VMI*, 518 U.S. at 533, 116 S.Ct. 2264.

It is true that some of defendants' arguments in favor of the policy have the hollow ring of sexual stereotypes. Defendants argue that a haircut of one inch in length would be considered an extreme hair style for a female inmate and that such haircuts might be used to symbolize involvement in a homosexual relationship with another inmate. These are stereotypical generalizations rather than real differences between females and males. Defendants also argue that shorter hair for male inmates saves time and effort during routine searches. None of these reasons qualifies as an important governmental interest under intermediate scrutiny. *Id.*

However, defendants' anecdotal evidence demonstrates problems of sanitation, health, safety, security and inmate identification created or exacerbated in the past by male inmates' long hairstyles and beards. Ra does not dispute defendants' assertions that they could provide additional, similar instances of these problems in male institutions if they undertook an exhaustive search of VDOC records. Moreover, the court must defer to the statement by John Jabe, Assistant Director of the VDOC, that prison officials did not rely on past problems in VDOC

institutions or other states in proactively formulating DOP 864 to "reduce the risk to public safety and public health posed by long hair and beards in the correctional environment." The court concludes that alleviating any one of the following problems qualifies an important governmental objective in the prison context: sanitation, health, safety for staff members and inmates, security and inmate identification.

Defendants have also explained clearly how requiring men to wear shorter hair substantially reduces the identified risks and, thus, further defendants' stated goals. Ra does not offer any evidence to dispute these explanations. Ra also does not dispute John Jabe's unsupported statement that female inmates are not as prone to be violent, to hide weapons in their hair, or to escape as male inmates. As most VDOC inmates are males and as males have had the history of problems with sanitation, health, safety, security and identification related to hair length, applying the short hair requirement only to men is substantially related to the important VDOC interest in alleviating these problems. For the most part, DOP 864 treats men and women with parity, and the slight disparity of treatment under the hair length and style provisions is exceedingly justified by valid, noneconomic and nonstereotypical reasons. *Bukhari*, 487 F.Supp. at 1172. Therefore, the court finds no genuine issue of material fact in dispute as to Ra's Equal Protection claim and grants summary judgment for the defendants.

### Motions to Amend

After defendants filed their motion for summary judgment in February 2000, Ra filed seven motions to amend or supplement his complaint. In the interest of efficient justice, the court grants these motions. However, inasmuch as the court finds that his allegations in the majority of these motions fail to state any claim upon which he is entitled to relief, the court dismisses these claims without prejudice, pursuant to 28 U.S.C. § 1915(e)(2). A complaint filed by an inmate challenging the conduct of an "officer or employee of a governmental entity" may be dismissed under § 1915A(b)(1) if the complaint is "frivolous, malicious or fails to state a claim upon which relief may be granted."

On March 7, 2000, Ra filed a motion to amend his complaint to name several female officers as additional defendants to his claim concerning the lack of shower curtains in December 1998 and 1999. He also seeks to add defendants to the grooming policy claims. The court grants this motion to amend. However, as the court has herein determined that Ra's claims concerning the showers and the grooming policy fail, the court dismisses all claims raised in the March 7 motion, pursuant to 28 U.S.C. § 1915A, for failure to state a claim upon which relief can be granted.

On March 3, March 13, March 20, March 30, April 12, and April 20, 2000, Ra moved to supplement or amend the complaint to name new defendants and state new claims related to the grooming policy. Upon review, the court finds that the allegations raised in these motions fail to state any claim under § 1983 and, accordingly, the court dismisses all these claims, pursuant to § 1915A.

In these motions, Ra alleges the following general sequence of facts. In early December 1999, he initiated a visit to the doctor, requesting a medical no-shave order. The doctor prescribed some cream and promised Ra a no-cost follow-up visit after he had used the cream for 30 days, at which time the doctor would determine whether to issue a no-shave order for Ra. Ra shaved and tried using the cream. The skin on his face reacted to the cream, causing extreme soreness, burning and cracking. Ra filed emergency grievances about this condition, but officials ruled the situation to be a nonemergency and told him to file a four-part request for a sick call visit. Because this sort of visit is not free, Ra did not file the proper request for several weeks. Ra cites two other inmates who received free medical no-shave orders without going through sick call. Ra's re-

peated attempts to file grievances about the follow-up and the reaction to the medication were not receipted. When the doctor finally gave Ra the free follow up visit four months later, he prescribed another cream and did not give Ra a no-shave order.

In February, March and April, 2000, officers told Ra he needed to shave his facial hair to comply with DOP 864. Ra would explain to them that shaving caused him skin problems and that he was waiting for a no-shave order from medical. Officers told him he could get Magic Shave from the commissary. Ra also told officers that he was in the process of proving in this lawsuit that DOP 864 is unconstitutional. However, because Ra's beard was not in compliance with DOP 864, officers sporadically suspended his commissary privileges and telephone privileges and placed him in detention/segregation without a hearing. Inmates with goatees were not locked up for failing to shave their facial hair. The officers also did not seem to know what Ra was supposed to use to shave his beard. Nevertheless, he was ultimately charged with violating a direct order to comply with the DOP, and officers conducted a disciplinary hearing. He asserts various due process violations related to this hearing: he met with his advisor only a few minutes before the hearing and he was not allowed to call witnesses (although he does not say who the witnesses were or how they would have helped his defense against the charge). Ra explained to the hearing officer that Ra had never been fully oriented about how to comply with DOP 864, as the officer assumed for purposes of the hearing.[5] Ra also complains that the appeals officer did not invalidate the conviction for due process violations.

After Ra used medication to shave, officers found him in compliance with DOP 964 and released him to the general population on April 3, 2000. However, he did not immediately have commissary privi-

leges because the assistant warden failed to notify the commissary manager that Ra's privilege was not restricted. Later that month, Officer Mullins told Ra that he needed to shave the stubble off his face. Ra told Mullins that he was waiting to get some Magic Shave and some prescribed medication in order to remove his facial hair without aggravating his sensitive skin. He told Mullins that he would sue if Mullins took security actions that interfered with his right to adequate medical treatment. Although other officers agreed with Ra, Mullins ordered that Ra be locked up because Mullins was "sick of his . . . mouth." Ra was apparently placed in segregation.

As demonstrated, the motions to amend/supplement give a running commentary of officials' enforcement of the grooming policy against Ra and raise several types of constitutional challenges. Ra alleges that defendants do not provide inmates with equipment necessary to comply with DOP 864 requirements in a consistent and safe manner. He alleges that the inmates who provide haircuts and nail clippers do not sanitize them after each use according to state health standards. He alleges that defendants do not provide inmates with sufficient fingernail clippers to comply with fingernail length requirements. Apparently, he raises these allegations as Eighth Amendment claims concerning hazardous conditions. However, the court cannot find that these allegations rise to constitutional proportions. Ra merely speculates that sanitation of razors, trimmers and clippers does not meet state health standards. Even if he could prove this assertion, he fails to demonstrate any substantial risk of serious harm, or future harm, resulting from his exposure to unsanitary clippers or razors. *Helling*, 509 U.S. at 31, 113 S.Ct. 2475; *Strickler*, 989 F.2d at 1380–1381.

■ Ra raises extensive complaints concerning his own attempts to get a medi-

---

**5.** Ra apparently refused orientation when it was offered.

cal excuse for not shaving in compliance with DOP 864. Ra fails to state any claim against the prison doctor or other medical personnel for refusing him a no-shave order or for delay in providing a follow up visit or medication. Disagreement with a doctor's medical decisions is nothing more than a claim of medical malpractice, which is not actionable under § 1983. *Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976)(medical malpractice does not become a constitutional violation because the patient is a prisoner). Moreover, Ra has not alleged facts indicating that he has any serious medical need entitling him to medication or a medical no-shave order. Only deliberate indifference to *serious* medical needs of prisoners constitutes unnecessary and wanton infliction of pain proscribed by the Eighth Amendment. *Id.*

Ra's allegations fail to implicate any federally protected liberty interest or implicate any federal due process right. Placement in segregation, periodic loss of privileges, and referral to ICA, all without a hearing, do not implicate any federal due process right, as these conditions are not a dramatic departure from the conditions of ordinary prison life. *Sandin,* 515 U.S. at 483, 115 S.Ct. 2293. Even if Ra's loss of privileges and placement in segregation violates some DOP due process requirement, violations of state law procedures do not present a federal due process problem. *See Riccio v. County of Fairfax, Va.,* 907 F.2d 1459, 1469 (4th Cir. 1990). Similarly, Ra has no federal due process claim concerning his disciplinary hearing. The only penalty he received for the conviction was loss of privileges and a temporary change in housing status. These inconveniences did not depart dramatically from ordinary incidents of prison life or affect the length of Ra's confinement. Accordingly, he had no federally protected liberty interest in avoiding these status changes, *Sandin,* 515 U.S. at 483, 115 S.Ct. 2293 and denial of state dictated procedures did not implicate constitutional rights.

Ra's allegations that he was treated differently than other inmates do not state any equal protection claim, as he has not demonstrated that he was similarly situated to these other inmates. *See Moss v. Clark,* 886 F.2d 686 (4th Cir.1989). His complaints about being denied telephone calls (apparently to his family) on isolated occasions fail to state any separate constitutional claim. *See, e.g., White v. Keller,* 438 F.Supp. 110 (D.Md.1977), *aff'd,* 588 F.2d 913 (4th Cir.1978)(neither prisoners nor would-be visitors have any constitutional right to prison visitation).

 Ra's allegations against Officer Mullins fail to state any § 1983 claim of retaliation. Retaliation against an inmate for the exercise of his right to access to the courts states a § 1983 claim. *Hudspeth v. Figgins,* 584 F.2d 1345 (4th Cir. 1978), *cert. denied,* 441 U.S. 913, 99 S.Ct. 2013, 60 L.Ed.2d 386 (1979); *Russell v. Oliver,* 552 F.2d 115 (4th Cir.1977). However, the inmate must allege sufficient facts to indicate that the alleged retaliation of which he complains resulted in some adversity to him sufficient to warrant concern about a chilling effect on the exercise of his right to access the courts. *American Civ. Liberties Union v. Wicomico County,* 999 F.2d 780 (4th Cir.1993). Moreover, the inmate must point to specific facts which tend to support his allegation of retaliation. *White v. White,* 886 F.2d 721 (4th Cir.1989). Ra has not demonstrated that Mullins' actions chilled his right to access the courts in any way. He immediately filed a motion to amend his lawsuit, naming Mullins as a defendant. In addition, Ra has not demonstrated that Mullins placed him in segregation for actual exercise of a constitutional right; at the most, Mullins reacted to Ra's threat of suit. In any event, Mullins legitimately placed Ra in segregation because he had not complied with the DOP beard requirements and because he disobeyed a direct order to shave.

In conclusion, the court finds no constitutional right implicated in Ra's long diatribe in the motions to amend/supplement about the enforcement of DOP 864 against him. Accordingly, all claims raised in these motions will be dismissed, pursuant to § 1915A. An appropriate order shall be issued this day.

The plaintiff is advised that he may appeal this decision pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure by filing a notice of appeal with this court within 30 days of the date of entry of this Order, or within such extended period as the court may grant pursuant to Rule 4(a)(5).

### ORDER

In accordance with the accompanying memorandum opinion, it is hereby

### ADJUDGED AND ORDERED

as follows:

(1) As to plaintiff's constitutional claims, defendants' motion for summary judgment shall be and is hereby **GRANTED** and plaintiff's motion for summary judgment shall be and hereby is **DENIED.**

(2) Plaintiff's motions to amend shall be and are hereby **GRANTED,** but all claims therein raised are hereby **DISMISSED,** pursuant to 28 U.S.C. § 1915A, for failure to state a claim upon which relief can be granted.

(3) Plaintiff's claims under state law are hereby **DISMISSED** without prejudice.

(4) All pending motions regarding reinstatement of, or accomplishing service upon, a defendant are hereby **DISMISSED** as moot.